IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DACIO PEREZ                              :    CIVIL ACTION
                                         :
                    v.                   :
                                         :
CAROLYN COLVIN, Acting                   :    NO.  12-5570
Commissioner of Social Security[1]

## REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J.                              April 3, 2014

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application filed by Mr. Dacio Perez ("Plaintiff") for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act.  For the reasons that follow, I find that substantial evidence

supports the findings of fact and conclusions of law of the Administrative Law Judge

("ALJ").  Therefore, I recommend that the final decision be affirmed.

## I.    PROCEDURAL HISTORY

On January 20, 2009, Plaintiff filed for SSI and DIB, alleging disability beginning

on November 30, 2007.  Tr. at 161, 168, 190.  These claims were denied initially on July

17, 2009.  Id. at 75, 80.  Plaintiff filed a written request for a hearing on August 7, 2009.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security
("Commissioner") on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure, Ms. Colvin should be substituted for Michael J. Astrue as Defendant in
this suit.  No further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act ("Act").  42 U.S.C. § 405(g).

Id. at 85-86.  On August 11, 2010, an ALJ held a video administrative hearing to consider the matter de novo.  Tr. at 35-72.  In a decision dated August 27, 2010, the ALJ denied Plaintiff's claims for disability.  Id. at 24-34.  On July 7, 2012, the Appeals Council denied Plaintiff's request for review.  Id. at 1-7.  Therefore, the decision of the ALJ is the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action on September 28, 2012.  See Doc. 1.  On January 22, 2013, Plaintiff submitted a motion for summary judgment and supportive memorandum of law.  See Docs. 9 & 9-1.  Defendant responded on March 25, 2013.  See Doc. 13.  The Honorable C. Darnell Jones, II, referred the matter to the undersigned for a Report and Recommendation.  See Doc. 15.

## II.   <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 495(g); Richardson v. Perales, 402 U.S. 389 (1971); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  The issue in this case is whether there is substantial evidence to support the conclusion that Plaintiff is not disabled.  To determine whether there is substantial evidence, the court must find "such relevant evidence as a reasonable mind might accept as adequate," and the evidence must be "more than a scintilla."  Burnett v. Comm'r Soc. Sec., 220 F.3d 112, 118 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The court has plenary review of legal issues.  Schaudeck v. Comm'r Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).

To prove disability, the claimant has the burden to demonstrate "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3. If so, whether based on medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listings of impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1, which results in a presumption of disability;

4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work; and

5. If the claimant cannot perform his past work, then the final step is to determine whether there is work in the national economy that the claimant can perform.

See Allen v. Barnhart, 417 F.3d 396, 401 n.2 (3d Cir. 2005) (quoting Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000) (internal citations omitted); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to prove that the claimant has the ability to perform other jobs in the national economy, in light of the claimant's age, education, work experience, and residual functional capacity.  Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

### III.    FACT RECORD AND THE ALJ'S DECISION

### A.    Plaintiff's Background and Medical Evidence

Plaintiff was born on January 30, 1967, and was therefore 40 years old at the time of the alleged onset of his disability and 43 years old at the time of the administrative hearing.  Tr. at 190.  Plaintiff is 5 feet 10 inches tall and weighs about 275 pounds.  Id. at 201.  Plaintiff attended school in Puerto Rico but did not complete high school.  See Doc. 9-1 at 3.[2]  Plaintiff has not completed any additional education, and his education is therefore considered "limited."  See 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3).  In his disability report, Plaintiff reported that his preferred language is Spanish, and he cannot speak or understand English.  Tr. at 201.  However, the ALJ determined Plaintiff is able to communicate in English.  Id. at 32.[3]

Plaintiff is married but explained that he and his wife had separated because of arguments over his waking up at night and her fear of his anger.  Tr. at 45, 58, 362.  Plaintiff currently lives with a friend.  Id. at 45.  Plaintiff visits his children daily,[4] visits his brother weekly, and attends church weekly.  Id. at 216.  Plaintiff's past relevant work

---

[2] There is inconsistent evidence regarding the level of Plaintiff's education.  He states in his brief that he completed the 9th grade, but he elsewhere reported completing 8th and 10th grade.  See Doc. 9-1 at 3; tr. at 201, 293.  The inconsistency does not affect the disposition of this case.

[3] The DDS disability worksheet notes that Plaintiff cannot speak English.  Tr. at 317.  However, during the administrative hearing, the ALJ asked Plaintiff questions in English, and Plaintiff responded in English.  Although his English was not perfect, the transcript indicates that Plaintiff was able to communicate in English.  In any event, Plaintiff does not seek remand on the basis of his inability to adequately speak English, nor do I find that remand on this issue is warranted.

[4] It is not clear how many children Plaintiff has or how old they are.

4

includes working at various temp agencies from 1996-2006, and most recently working at Ashley Furniture Company in Reading as a production/laborer in 2007.  Id. at 202. Plaintiff is independent in all areas of personal care, except he has difficulty putting on his shoes due to his obesity.  Id. at 57, 61, 213-14.  He claimed disability due to a combination of physical and mental problems, including obesity, degenerative joint disease of his left knee, hepatitis C, and depression, and that he has limited concentration, fatigues quickly, has pain in his legs, suffers from migraines, and has difficulty hearing and following instructions.  Id. at 202, 281.

Records related to Plaintiff's physical impairments are sparse.  On May 7, 2009, Ronald Vandegriff, D.O., performed a medical consultative examination of Plaintiff.  Tr. at 281-89.  Dr. Vandegriff listed Plaintiff's diagnoses as hepatitis C, left knee pain of unknown etiology, and depression.  Id. at 283.  The doctor indicated that Plaintiff could frequently lift and carry items weighing up to 25 pounds and occasionally lift and carry items as heavy as 50 pounds.  Id. at 284.  Dr. Vandegriff opined that Plaintiff can stand or walk for six hours or more during an eight-hour workday, and can spend eight hours alternating between sitting and standing.  Id.  Plaintiff's ability to push and pull is unlimited, and he can reach, handle, finger, feel, see, hear, speak, taste, smell, and control continence without impairment.  Id. at 285.  Plaintiff can bend and kneel occasionally, but he can never stoop, crouch, balance, or climb.  Id.

The majority of Plaintiff's records concern his mental impairments.  Plaintiff received mental health treatment from New Direction Treatment Services ("New Direction") since June 2005.  Tr. at 277.  As part of this treatment, Plaintiff receives

weekly individual counseling, weekly random drug screenings, and daily Methadone

dosing. Id. at 340.[5]  In a letter dated April 6, 2009, New Direction personnel explained

that the facility is unable to furnish treatment information that would support a disability

claim. Id. at 277.  In a treatment letter dated July 7, 2010, Carlos Santillan, a methadone

counselor, reported that Plaintiff had been compliant with all aspects of his treatment and

was motivated to make the necessary changes to achieve his treatment goals. Id. at 340.

The record also contains mental health treatment records from Berks Psychiatry

from April 2009 through August 2010. Tr. at 300-12, 341-68.[6]  At his initial assessment

on April 3, 2009, by Melinda Castro, M.A., Plaintiff reported hearing voices, depression,

explosive anger, and problems sleeping including becoming aggressive and nightmares of

the death of a friend. Id. at 308.  He appeared healthy and well-groomed and no

abnormalities were noted in his mental status exam other than poor judgment. Id. at 311.

He was taking Sertraline, [7] and described a significant substance abuse history, but

reported that he had not used alcohol or illicit drugs for at least three years. Id. at 310.

Ms. Castro diagnosed Plaintiff with Major Depressive Disorder,[8] Post-Traumatic Stress

---

[5] Methadone is an opioid medication used to reduce withdrawal symptoms in people addicted to heroin or other narcotic drugs.  See http://www.drugs.com/search.php?searchterm=methadone (last visited Mar. 20, 2014).

[6] Certain of these records, specifically for April 3, 14, and 24, and May 30, 2009, appear twice in the record.  Tr. at 300-12, 356-66.  Because they are more legible, pages 300-12 will be cited.

[7] Sertraline (or Zoloft) is an antidepressant.  See http://www.drugs.com/setraline (last visited Mar. 20, 2014).

[8] The essential feature of Major Depressive Disorder is a clinical course that is

Disorder[9] and Intermittent Explosive Disorder.[10]  Id. at 312.  She also assigned a Global

Assessment of Functioning ("GAF") of 35[11] and referred him to Dr. Khan for

examination.  Plaintiff was seen by a psychiatrist, presumably Dr. Khan, on April 14,

2009.  Id. at 304-06.  Plaintiff reported a history of psychiatric hospitalizations and three

prior suicide attempts by pills.  He described hearing voices for years and was suspicious

that people were trying to hurt him, and he thought that the television sends him special

messages.  He also reported trouble sleeping and periods of depression.  Id. at 304.  The

---

characterized by one or more Major Depressive Episodes.  Diagnostic and Statistical
Manual of Mental Disorders 369 (4th ed. Text Revision 2000) ("DSM IV-TR"). A Major
Depressive Episode is a period of at least 2 weeks during which there is either depressed
mood or the loss of interest or pleasure in nearly all activities.  Id. at 349.  The 5th edition
of the DSM was recently released, but the prior version was in use at the time of the
ALJ's decision.

[9] Post-Traumatic Stress Disorder ("PTSD") is characterized by personal exposure
to a severe traumatic event, persistent re-experience of the event, persistent avoidance of
associated stimuli, and persistent symptoms of increased arousal (such as insomnia or
irritability) for more than one (1) month, that causes clinically significant distress or
impairment in social, occupational, or other important areas of functioning.  DSM IV-TR
at 468.

[10] "The essential feature of Intermittent Explosive Disorder ("IED") is the
occurrence of discrete episodes of failure to resist aggressive impulses that result in
serious assaultive acts or destruction of property" and that are "grossly out of proportion
to any provocation or psychosocial stressor."  DSM IV-TR at 663-64.

[11] The Global Assessment of Functioning ("GAF") score is a measurement of a
person's overall psychological, social, and occupational functioning on a hypothetical
continuum of mental health-illness.  )."  DSM IV-TR at 32-34.  A GAF between 31-40
indicates "[s]ome impairment in reality testing or communication (e.g. speech is at times
illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or
school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends,
neglects family, and is unable to work)."  Id. at 34.

psychiatrist diagnosed Plaintiff with chronic paranoid schizophrenia[12] and schizoaffective

disorder, depressed type,[13] and assigned a current GAF of 50 and a GAF for the past year

of 55.  Id. at 306.[14]

Treatment notes from Berks Psychiatry indicate that Plaintiff often complained

about depression, that he tried to minimize his anger episodes, and that he often stayed in

his room for hours watching television.  See, e.g., tr. at 346 (3/19/10), 348 (2/15/10), 350

(1/14/10).  The records consistently characterize Plaintiff as talkative and engaged in

conversation, and he was noted to be oriented to time, place, and person.  He reported

difficulty sleeping and he had nightmares in which his deceased friend spoke to him.  Id.

at 362.  During the course of treatment he was prescribed Methadone, Trazodone,

---

[12] "The essential features of Schizophrenia are a mixture of characteristic signs and symptoms . . . that have been present for a significant portion of time during a 1-month period (or for a shorter time if successfully treated)" and which "involve a range of cognitive and emotional dysfunctions that include perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention."  DSM-IV-TR at 298-99.

[13] "The essential feature of Schizoaffective Disorder is an uninterrupted period of illness during which, at some time, there is a Major Depressive, Manic or Mixed Episode concurrent with symptoms" of Schizophrenia.  DSM-IV-TR at 319.

[14] A GAF score of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  DSM IV-TR at 34.  A GAF score of 51-60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  Id.

Risperdal, Lithobid, and Cymbalta.[15]  Id. at 54-55, 310, 312.  Plaintiff reported that the

medication helped and that he took it as scheduled.  See, e.g., id. at 343 (8/2/10), 344

(4/12/120), 346 (3/14/10).

On May 3, 2009, Thomas Schwartz, Ph.D., conducted an in-person psychological

consultative evaluation of Plaintiff.  Tr. at 290-98.  Plaintiff arrived a half hour early, but

seemed confused as to the purpose of the appointment.  Id. at 291.  During the

appointment, Plaintiff's cooperation ranged from fair to good, and he "displayed a

reasonably adequate ability to articulate his thoughts, which were sufficiently productive

and spontaneous, as well as goal-directed, relevant and coherent."  Id. at 295.  Plaintiff

reported hearing voices but denied delusions and paranoid ideation, and he appeared sad,

anxious and irritable.  Id.  He also reported that his medication was "partially helpful"

and that he took it every day.  Id. at 293.  Regarding Plaintiff's reliability, Dr. Schwartz

reported that "[s]ome of [Plaintiff's] mental status was plausible, but others were so poor

as to strain the examiner's credulity."  Id. at 295.  For example, Dr. Schwartz observed

that Plaintiff was only employed two to four years and yet no mental health

documentation was provided.  Also, Dr. Schwartz noted that some of Plaintiff's

---

[15] Trazodone is an antidepressant medicine used to treat major depressive disorder. See http://www.drugs.com/search.php?searchterm=trazodone (last visited Mar. 20, 2014). Risperdal is indicated for the treatment of schizophrenia.  It is also used as a monotherapy or as adjunctive therapy to lithium or valproate for the maintenance treatment of Bipolar I Disorder.  Physician's Desk Reference, 1269 (67th ed. 2013) ("PDR 2013").  Lithobid, or lithium, is used to treat the manic episodes of manic depression.  See http://www.drugs.com/search.php?searchterm=lithobid (last visited Feb. 28, 2014). Cymbalta is a serotonin and norepinephrine reuptake inhibitor (SNRI) indicated for Major Depressive Disorder, Generalized Anxiety Disorder, Diabetic Peripheral Neuropathic Pain, Fibromyalgia, and Chronic Musculoskeletal Pain.  PDR 2013 at 1322.

responses to simple orientation were difficult to fathom, including incorrectly identifying the year as 2008, the month as March, and not knowing the state where he lived, yet able to correctly state his address.  Id.  Plaintiff displayed marginal fund of knowledge, weak abstract thinking, intact but vague memory and extremely poor immediate recall and concentration.  Id. at 296.  Dr. Schwartz diagnosed Plaintiff with Mood Disorder Not Otherwise Specified, under fair control with medications and therapy, and rule out Bipolar Disorder, [16] and also Antisocial Personality Disorder. [17]  Id. at 297.  According to Dr. Schwartz, Plaintiff's prognosis for maintaining his current level of functioning or possibly achieving some further improvement in the next 6-12 months is "fair."  Id. at 297-98.  The doctor assessed Plaintiff's long-term prognosis as "cautiously fair under present supervised conditions."   Id. at 298.

On June 24, 2009, Peter Garito, Ph.D., reviewed Plaintiff's psychological record and completed a Mental RFC assessment and a Psychiatric Review Technique Form ("PRTF").  Tr. at 321-24, 325-38.  In the Mental RFC assessment, Dr. Garito opined that Plaintiff was "moderately impaired" in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being

---

[16] Bipolar disorder, or manic-depressive illness, is more accurately a group of disorders generally characterized by mild, moderate, or severe episodes of manic, mixed, or major depressive moods.  DSM IV-TR at 382-83.

[17] The essential feature of Antisocial Personality Disorder "is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood."  DSM IV-TR at 701.  The record contains reference to a Plaintiff's history of arrest and incarceration.  See tr. at 59, 294, 309.

distracted by them, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting.  Id. at 321-22.  In all other areas, Dr. Garito opined that Plaintiff was "not significantly limited."  Id.  There were no areas in which Dr. Garito opined that Plaintiff's ability was "markedly limited." Id.  Based on the evidence of the record, Dr. Garito found that Plaintiff's statements were "partially credible."  Id. at 323.  Dr. Garito concluded that Plaintiff "is able to meet the basic mental demand of competitive work on a sustained basis despite the limitations resulting from his impairment."  Id.

In the PRTF, Dr. Garito listed Plaintiff's diagnoses as ADHD,[18] Bipolar Disorder, NOS ("Not Otherwise Specified"), and Antisocial Personality Disorder.  Tr. at 325-38. Dr. Garito opined that the identified medically determinable impairments do not precisely satisfy the diagnostic criteria.  Id. at 326, 328, 332.  In the PRTF, Dr. Garito opined that Plaintiff had "mild" restriction of activities of daily living, "moderate" difficulties in maintaining social functioning, and "moderate" difficulty in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Id. at 335.

### B.    Hearing Testimony and the ALJ's Opinion

On August 11, 2010, the ALJ held a video hearing to review Plaintiff's DIB and SSI claims.  Tr. at 24, 35-72.  Plaintiff testified that he spends most of the day in his room watching TV, and he does not like leaving his house.  Id. at 54.  Plaintiff also testified

---

[18] ADHD or Attention-Deficit/Hyperactivity Disorder "is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." DSM IV-TR at 85.

that he has a car, which he drives three to four times per week, for about 15-20 minutes. Id. at 45. Plaintiff stated that he tries to bring someone with him when he drives so he does not get lost. Id. at 46. Plaintiff testified that he most recently worked at Ashley Furniture assembling furniture, but his employer laid him off because of attitude problems with co-workers. Id. at 47-48. Plaintiff explained that he does not know how to deal with his anger and that he has difficulty following instructions. Id. at 51, 59. When the ALJ asked the Plaintiff about his ability to complete an unskilled job that had little interaction with people, Plaintiff responded that he would have problems because he makes mistakes and hears voices. Id. at 48-49.

With respect to his psychiatric conditions, Plaintiff testified that he sees a therapist three times a month and a psychiatrist once a month. Tr. at 49. He testified that he had suicidal thoughts in the past, but he has not had suicidal thoughts since he stopped using illicit drugs. Id. at 50-51. Plaintiff stated that it had been approximately five years since he last used illicit drugs. Id. at 44. At his hearing, Plaintiff reported that he is currently prescribed Methadone, Trazodone, Risperdal, and Cymbalta, and that his medications do not cause any side-effects other than heartburn. Id. at 55-56. Plaintiff testified that due to his memory problems his roommate reminds him to take his medications. Id. at 57. Plaintiff does not require other reminders to complete daily tasks, and he stated that he is able to take care of himself, except he has difficulty tying his shoes. Id. at 57, 61. Because of his depression, he no longer fishes, plays sports, or lifts weights. Id. at 61-63. Plaintiff reported that his friends no longer visit him, because they say his personality has changed. Id. at 63.

12

At the administrative hearing, the ALJ obtained testimony from a Vocational Expert ("VE").  Tr. at 66-70.  The VE reported that all of Plaintiff's past relevant work is categorized as medium exertion level[19] and unskilled.  Id. at 66-67.  The ALJ asked the VE to consider a person of the same age, education, and work experience as Plaintiff who is limited to light work[20] not involving the sale or distribution of alcohol or pharmaceutical products, occasional bending, crawling, kneeling and stooping, limited to unskilled or entry-level positions, who can understand, remember and carry out simple instructions in English, and with minimal interaction with others.  Id. at 67.  In response, the VE stated that such a person could be employed as a bakery worker on a conveyor line, a marker tagging clothing or items in a warehouse, or a cleaner/housekeeper.  Id. at 67-68.  Asked to consider an individual who basically stays in his room all day, is afraid to go places, has problems with his attitude, following directions, and meeting production

---

[19] Medium work involves lifting no more than fifty (50) pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five (25) pounds.  20 C.F.R. §§ 404.1567(c), 416.967(c).  If someone can do medium work, the Social Security Administration has determined that he or she can also do sedentary and light work.  Id.

[20] Light work involves lifting no more than twenty (20) pounds at a time with frequent lifting or carrying of objects weighing up to ten (10) pounds.  20 C.F.R. §§ 404.1567(b); 416.967(b).  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  Id.  To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.  Id.  If someone can do light work, the Social Security Administration has determined that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  Id.

schedules, experiences paranoid thoughts and is seeking psychiatric help, the VE agreed

that such a person would not be able to work.  Id. at 68-70.

    In the five-step sequential analysis, the ALJ found:

1. Plaintiff has not engaged in substantial gainful activity since November
   30, 2007, the alleged onset date.  Tr. at 26.

2. Plaintiff has the following severe impairments: obesity, degenerative
   joint disease of the left knee, hepatitis C, a schizophrenic disorder, an
   affective disorder, an anxiety disorder, and a personality disorder.  Id.

3. Plaintiff does not have an impairment or combination of impairments
   that meets or medically equals one of the listed impairments in 20 CFR
   Part 404, Subpart P, Appendix 1.  Id. at 27.

4. Plaintiff has the RFC to perform light work, except that due to his
   obesity and left knee impairments as well as hepatitis C, he is limited to
   occasional stooping, crawling, kneeling, and squatting.  As a result of
   his mental impairments, he is capable of understanding, remembering
   and carrying out simple instructions, and he is limited to minimal
   interaction with others.  At step four, the ALJ found that Plaintiff was
   unable to perform any past relevant work.  Id. at 27, 32.

5. Considering Plaintiff's age, education, work experience, and residual
   functional capacity, there are jobs that exist in significant numbers in
   the national economy that the Plaintiff can perform.  Id. at 33.

    As a result of the five-step analysis, the ALJ found Plaintiff not disabled.  Tr. at

33.  In his memorandum, Plaintiff argues that the ALJ's decision is not supported by

substantial evidence because (1) the ALJ erred in weighing the opinions of treating and

non-treating professionals, and (2) the ALJ minimized Plaintiff's impairments when

analyzing the paragraph B criteria of Listings 12.03, 12.04, 12.06, and 12.08 and

overlooked certain relevant evidence.  See Doc. 9-1 at 4-5.[21]  Defendant counters that the

ALJ's decision is supported by substantial evidence.  See Doc. 13.

## IV.    DISCUSSION

### A.    Weight Given to Opinions of Mental Health Professionals

Plaintiff contends that the ALJ's decision is not supported by substantial evidence

because the ALJ failed to properly weigh the evidence.  Specifically, Plaintiff claims the

ALJ relied more heavily on the doubts expressed by Dr. Schwartz, a psychologist, rather

than Plaintiff's treating physicians at New Direction and Berks Psychiatry.  See Doc. 9-1

at 4-5.  Defendant counters that this aspect of the ALJ's opinion is supported by

substantial evidence.  See Doc. 13 at 8-14.

A treating physician's opinion is entitled to great weight, especially when the

treating physician's opinion is "based on a continuing observation of the patient's

condition over a prolonged period of time."  See Plummer v. Apfel, 186 F.3d 422, 429

(3d Cir. 1999) (citing Rocco v. Heckler, 826 F.3d 1348, 1350 (3d Cir. 1987); see also 20

C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ may rely upon medical opinions from

both physicians and psychologists.  See 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  In

addition to treating physicians, the ALJ must also consider the findings of state agency

medical and psychological consultants who are highly qualified in Social Security

disability evaluation.  See id. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  Generally, the more

consistent the opinion of the professional is with the record as a whole, the more weight

---

[21] Plaintiff's brief is somewhat vague and unstructured.  I have numbered
Plaintiff's claims to assist in addressing the various issues raised.

the ALJ will give to that opinion.  See id. §§ 404.1527(c)(4), 416.927(c)(4).  The ALJ

will also generally give more weight to the opinion of someone who has examined the

patient than to someone who has merely reviewed the record to make an assessment.

See id. §§ 404.1527(c)(1), 416.927(c)(1).  An ALJ's analysis is proper if the ALJ

articulates, at some minimal level, his analysis and does not completely ignore a line of

evidence.  See Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008).

The ALJ considered evidence from non-examining, examining, and treating

physicians.  When weighing the evidence, the ALJ found:

> The objective medical evidence reflects that while [Plaintiff]
> suffers from multiple impairments, his ability to function is
> not limited to the degree alleged.  [Plaintiff's] mental health
> treatment has remained most conservative in nature, with no
> hospitalizations or inpatient treatment  . . . or emergency
> medical treatment [of] record.  Indeed, no regular mental
> treatment is given in the record until April 2009, and,
> although initial evaluations assessed significant limitations in
> general functioning, improvement was documented the same
> month with medications and continued thereafter.  Further,
> while the psychological consultative examination noted what
> Dr. Schwartz characterized as surprisingly low abilities in
> several areas, he indicated a lack of veracity with respect
> thereto . . . .  In addition, [Plaintiff's] admitted activities of
> daily living, including independent personal care . . . serve to
> diminish the persuasiveness of his allegations.
>
> State Agency psychological consultants opined that [Plaintiff]
> is moderately limited in his ability to understand, remember
> and carry out detailed instructions; maintain attention and
> concentration for extended periods; work in coordination with
> or proximity to others without being distracted; accept
> instructions and respond appropriately to criticism from
> supervisors; and respond appropriately to changes in the work
> setting.  Said consultants concluded that [Plaintiff] is able to
> meet the basic mental demands of competitive work on a
> sustained basis despite the limitations resulting from his

16

mental impairments.  Social Security Ruling 96-6 requires that the opinions of State agency medical and psychological consultants be treated as expert opinion evidence from nonexamining sources.  The undersigned accords this opinion significant probative weight because it is consistent with the medical evidence as a whole; however, said consultants did not have the opportunity to observe or examine [Plaintiff]. .

. . . .

Medical treatment records, written statements, and testimony from [Plaintiff] support the undersigned's finding that [Plaintiff] has the [RFC] to perform light work  . . . except, due to his obesity and left knee impairment as well as hepatitis C, he is limited to occasional stooping, crawling, kneeling and squatting.  As a result of his mental impairments, he is capable of understanding, remembering and carrying out simple instructions, and he limited to minimal interaction with others.  In sum, the [RFC] is supported by the above-described objective treatment records, the consultative examinations, [Plaintiff's] admitted daily activities subsequent to his alleged onset date, and [Plaintiff's] less than persuasive testimony.

Tr. at 31-32 (record citations omitted).

Initially, Plaintiff's argument that the ALJ gave more weight to the opinions of the non-treating health care provider than to the opinions of the other professionals is misguided in that Plaintiff's treating professionals did not offer opinions on limitations in Plaintiff's functional abilities.  Nevertheless, the ALJ discussed all of the records and opinions from the treating mental health professionals, as well as the reports of the consulting professionals.  For example, the ALJ discussed records from New Directions, even though a letter from New Direction dated April, 6, 2009, specifically stated that they could not furnish treatment information that would support a disability claim.  Tr. at 29, 277.

17

Plaintiff claims the ALJ dismissed records from Berks Psychiatry "only because they were hard to read." Doc. 9-1 at 4. In his opinion, the ALJ noted that the "[o]ngoing treatment notations provide minimal objective observations or assessments and are of limited legibility." Tr. at 30. Despite limitations in legibility, the ALJ did not ignore these opinions, and made reference to assessments throughout Plaintiff's treatment. Id. The ALJ discussed the Berks Psychiatry records beginning in April 2009, noting the mental status examination of the treating professionals, Plaintiff's diagnoses, and Plaintiff's GAF scores. Id. at 30.

Even if Plaintiff were correct in arguing that the ALJ improperly weighed the evidence, my conclusion would not change. None of the treating or examining health professionals opined that Plaintiff was disabled.[22] In fact, the reports from Dr. Schwartz mostly corroborated the treatment notes from Berks Psychiatry. At Berks Psychiatry, Ms. Castro assigned Plaintiff an initial GAF score of 35 on April 3, 2009, and then on April 14, 2009, the psychiatrist assigned Plaintiff a GAF of 50, and a GAF score of 55 for the past year. Tr. at 306, 312. Although there are no other GAF scores in the record, the treatment notes that followed these initial assessments showed that he was responding well to new medications that were prescribed and the therapy sessions he was attending. Id. at 341-59. Dr. Schwartz reported "surprisingly low abilities in several areas," but the doctor also commented on Plaintiff's lack of veracity with respect to many of Plaintiff's

---

[22] As will be discussed below, none of the mental health experts who treated Plaintiff or examined him opined that his mental health impairments met or equaled one of the Listings.

18

assertions based on Plaintiff's "two to four year history of employment at various jobs and lack of mental heath treatment." Id. at 31. Plaintiff's records show no hospitalizations or inpatient treatment related to his mental conditions in the relevant time frame.[23] In short, although the records document that Plaintiff suffers from certain psychiatric symptoms and disorders, it does not document resulting functional limitations.

Accordingly, I conclude that substantial evidence supports the ALJ's assessment of the records and opinions of the treating and examining mental health professionals.

## B.      Step Three – Listings of Impairments

Plaintiff also claims that the ALJ's opinion is not supported by substantial evidence because the ALJ minimized Plaintiff's impairments and thereby incorrectly evaluated the paragraph B criteria of Listings 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.08 (Personality Disorders). See Doc. 9-1 at 5. Plaintiff also argues that the ALJ ignored relevant evidence, including Plaintiff's hearing voices, his suicide attempts, and his mental health hospitalizations. Id. at 4-5. Defendant counters that this aspect of the ALJ's evaluation of the Listings is supported by substantial evidence, and that the ALJ did not ignore relevant evidence. See Doc. 13 at 2-8.

---

[23] Plaintiff's argument that the ALJ ignored hospitalizations that pre-date Plaintiff's alleged onset date and which are not evidenced in the record will be discussed in the next section.

With respect to the disorders identified by Plaintiff, a mental health Listing is met if the claimant satisfies the criteria either in both paragraphs A and B, or in paragraph C.[24]  Plaintiff challenges the ALJ's determination only as to paragraph B, and the language of paragraph B is identical for each Listing.  Specifically, paragraph B of each relevant Listing requires that the mental impairment result in at least two of the following: "(1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration."  Listing 12.03(B), 12.04(B), 12.06(B), 12.08(B), Pt. 404, Subpt. P, App. 1. [25] A marked restriction is more than moderate, but less than extreme.  See Listing 12.00(C), Pt. 404, Subpt. P, App. 1.  Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks.  Id.  Because the paragraph B criteria are identical for each of the relevant Listings, they will be considered together.

At step three, the ALJ stated the following:

> [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.03, 12.04, 12.06, and 12.08.  In making this

---

[24] The A criteria for each Listing consists of documentation of certain diagnostic symptoms, whereas the C criteria consist of alternate methods for establishing disability specific to each category of illness.  Plaintiff makes no argument that he satisfies any C criteria.

[25] The PRTF completed by Dr. Garito considered the criteria of the Listings identified by Plaintiff (12.04, 12.06 and 12.08) except for Listing 12.03.  Tr. at 325-33. The ALJ considered all of the Listings at issue.

finding, the undersigned has considered whether the
"paragraph B" criteria are satisfied. . . .

In activities of daily living, [Plaintiff] has no more than mild
restriction.  Mr. Perez advised that he is independent in all
areas of personal care but has difficulty putting on his shoes
due to obesity.  He prepares meals, including rice, beans,
meat, salads, and scrambled eggs, and he performs housework
including dishes, cleaning the bathroom, sweeping the house,
working the yard and decorating.  He detailed that he works
indoors cooking and cleaning for about four hours and works
outdoors for about two hours.  Further, [Plaintiff] offered that
he operates a motor vehicle about three or four times per
week, but hedged upon questioning from his representative
that he apparently takes someone with him because he is
afraid of getting lost.  He further shops in stores for clothes,
shoes and/or food every two weeks.  In social functioning,
[Plaintiff] has moderate difficulties.  While he enjoys meeting
with his children daily, goes to his brother's house weekly,
and sometimes attends church, he contended that he leaves
his home less often than he once did, only going out when
necessary.  He further goes grocery shopping when needed,
but he has a reported history of angry outbursts with others.
With regard to concentration, persistence or pace, [Plaintiff]
has moderate difficulties.  Although he was reportedly able to
care for three children and perform all needed activities
around his home, a consultative mental statutes examination .
. . noted poor concentration and immediate recall.  However,
said results were specifically called into question by the
examiner.  As for episodes of decompensation, [Plaintiff] has
experienced no episodes of decompensation, which have been
of extended duration.

Because [Plaintiff's] mental impairments do not cause at least
two "marked" limitations or one "marked" limitation and
"repeated" episodes of decompensation, each of extended
duration, the "paragraph B" criteria are not satisfied.

Tr. at 27 (record citations omitted).

As correctly noted by the ALJ, the record does not support marked restrictions in

activities of daily living.  Dr. Garito found that Plaintiff had only mild restrictions in

21

activities of daily living.  Tr. at 335.  Plaintiff testified at his hearing and reported at many of his mental health assessments that he is able to care for himself independently and tend to his own personal care, except that he has difficulty putting on his socks and shoes due to his obesity.  Id. at 57, 61 213.  Plaintiff indicated in a Function Report that he is able to prepare his own meals, including cooking rice, beans, meat, salads, and scrambled eggs, and when visiting his children he often brings them food he has prepared.  Id. at 212, 214.  Plaintiff maintains his home performing housework and yardwork, including washing dishes, cleaning the bathroom, sweeping, working in the yard, and decorating.  Id. at 214.

The record also supports the ALJ's finding that Plaintiff does not have marked difficulties in maintaining social functioning, but rather moderate restrictions as also found by Dr. Garito.  Tr. at 335.  Plaintiff reports socializing less often and experiencing anxiety around people, and the record contains several references to Plaintiff's history of anger issues.  However, the record also shows that he leaves his home on a regular basis. For example, he visits his children daily and his brother weekly, he attends church and support group meetings weekly, and he shops and receives treatment at a methadone clinic regularly.  Tr. at 212, 216, 323.  In response to a Function Report question about the kinds of things he does with others, Plaintiff stated "I talk in person w/ my friend's friends."  Id. at 216.

Similarly, the record supports the ALJ's finding that Plaintiff does not have marked difficulties in maintaining concentration, persistence, or pace.  Dr. Garito opined that Plaintiff has moderate difficulties in this area, specifically noting that he was

22

"moderately impaired" in certain abilities, specifically to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or in proximity to others without being distracted by them.  Tr. at 321, 335.  However, Plaintiff was "not significantly limited" in any other relevant abilities, including to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, and make simple work-related decisions.  Id. at 321.  Medical records from Berks Psychiatry indicate that Plaintiff maintained eye contact and engaged in conversations, that he was oriented to time, place, and person, and that he took his prescribed medications regularly.  Id. at 341-65.  In addition, Plaintiff described his typical day in terms of a routine, starting with getting his Methadone followed by household tasks such as cooking and watching television, and that he goes outside every day.  Id. at 212, 215.

Lastly, at no time during Plaintiff's assessments has there been any report of decompensation from Plaintiff himself or from his healthcare providers.  Plaintiff contends decompensation is evident from the hospitalizations that were overlooked by the ALJ, specifically his suicide attempts and mental health hospitalizations, including those at Valley Forge, Bowling Green, Reading Hospital, and the YMCA.  See Doc. 9-1 at 5.  However, all indications are that his hospitalizations related to suicide attempts that long preceded his sobriety and his maintenance on Methadone.

Plaintiff admitted that he had a long history of polydrug abuse and addiction, including cocaine, heroin, acid, and marijuana.  Tr. at 294.  Despite this history of abuse, Plaintiff stated he has been "clean of everything" for four years.  Id.  Dr. Schwartz's May

23

2009 evaluation discussed some of his hospitalizations, but Dr. Schwartz did not know whether these were strictly psychiatric hospitalizations, and at least some of the hospitalizations had a dual component of drug and alcohol rehabilitation.  Tr. at 293. Additionally, Plaintiff's most recent hospitalization apparently occurred in 2004, more than three years before his alleged onset date of November 30, 2007, and approximately six years before his administrative hearing.  Id.  Plaintiff also reported three incidents of attempted suicide with heroin or pills, but again it is unclear when these events occurred, whether drugs and/or alcohol were involved, or whether these incidents required hospitalizations.  Id.  At no point during his treatment at Berks Psychiatry did a physician or psychiatrist report Plaintiff to be a suicide risk.  See id. at 341-68.

At his hearing, Plaintiff mentioned that he hears voices, which he has experienced since he was a young child, and his diagnosis and treatment at Berks Psychiatry confirm that he suffers a psychotic disorder that includes hearing voices and also depression.  Tr. at 49, 308, 312.  Nevertheless, Dr. Garito opined that Plaintiff has been working for much of his adult life, and the symptoms associated with hearing voices do not seem to have significantly affected his functional abilities.  Id. at 323.  Dr. Schwartz reported that Plaintiff did not mention any hallucinations in his disability report.  Id. at 293.  Further, consistent with Plaintiff's treatment record, Dr. Schwartz stated that with regard to Plaintiff's veracity, some of his mental status indicators were so poor as to strain his credibility.  Id. at 295.  This is consistent with the RFC assessment made by Dr. Garito, who noted that Plaintiff's statements were only "partially credible."  Id. at 323.  While there may remain some question as to the extent of Plaintiff's psychiatric symptoms, the

24

record does not contain evidence of any decompensations of extended duration during the relevant time period.

For these reasons, I find the ALJ's consideration of the Listings at step three of the sequential evaluation is supported by substantial evidence.

## V.    <u>CONCLUSION</u>

After careful review of the record, I conclude that the ALJ considered the relevant evidence, including Plaintiff's RFC and Plaintiff's medical records, gave proper weight to assessments made by Plaintiff's examining and treating mental health professionals, and properly concluded that plaintiff did not satisfy any listed impairment.  Therefore, I conclude that the ALJ's opinion is supported by substantial evidence.

Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this  3rd    day of   April        2014, it is RESPECTFULLY

RECOMMENDED that Commissioner's decision denying Plaintiff's application for DIB

and SSI be AFFIRMED.  The petitioner may file objections to this Report and

Recommendation.  See Local Civ. Rule 72.1.  Failure to file timely objections may

constitute a waiver of any appellate rights.

BY THE COURT:

/s/ELIZABETH T. HEY

_____

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE